## THE FITCHBURG RAILROAD COMPANY *vs*. THE BOSTON & MAINE RAILROAD.

The authority of the court of common pleas, to set aside the verdict of a sheriff's jury, for good cause, is only to be exercised for some cause affecting the legality, justice, or merits of the case.

If an adjudication of the court of common pleas, setting aside the verdict of a sheriff's jury, is founded upon any cause contained in the warrant, return, or verdict, such cause is matter of law apparent upon the record, and will come before this court on appeal; if the adjudication is founded on a cause shown *aliunde*, — under which designation, the record of the anterior proceedings before the commissioners is to be included, if such record is adduced for the pur pose of showing any fact affecting the merits of the case, — such cause is matter of fact, upon which the decision of the court of common pleas is conclusive; and if either party objects in this court to any decision or adjudication of the court of common pleas, in matter of law, the ground of such objection must be specially stated in the decision or adjudication itself, or in a bill of exceptions filed and allowed in that court.

If the proceedings of county commissioners, in estimating damages for land taken for a railroad, are irregular, the remedy is to be sought by an application to this court for a *certiorari*, and not by an application to the commissioners for a jury to revise the damages. If the latter course be taken, it is an admission that the previous proceedings are regular, and a waiver of exceptions thereto.

When application is made to county commissioners, for the assessment of damages for land, &c., taken for a railroad, and it is brought to the knowledge of the commissioners, before a warrant is issued for a jury, that there are other parties interested who have made no application, and such parties are thereupon summoned in, their damages are first to be assessed by the commissioners, before the case is sent to a jury.

Where the estimate made by county commissioners of the damages sustained by a tenant for years, in consequence of the location and construction of a railroad over his estate, is revised by a jury, on the petition of such tenant, and the verdict of the jury is set aside by the court of common pleas, and the case remanded to the county commissioners; it seems, that it is competent to the commissioners, on the motion of the petitioner, to dismiss the petition for a jury, and to bring forward the original petition, and to summon in the reversioner to become a party thereto, and thereupon to proceed to estimate the whole damages, and to apportion the same between the parties interested. If such proceeding be objectionable, it can only be excepted to by the lessee, and not by the proprietors of the railroad.

On an appeal to this court, from an adjudication of the court of common pleas,

The Fitchburg Railroad Company *v.* The Boston & Maine Railroad.

accepting the verdict of a sheriff's jury, assessing damages for land taken for a railroad, it being objected by the respondent, that the board of county commissioners, when making an estimate of the damages, in the first instance, was not duly constituted ; and the ground of this objection appearing only on the record of the proceedings before the commissioners, a copy of which was among the papers in the case ; it was held, that this objection was not open upon the appeal, and that if well founded originally, the respondents had waived it by proceeding before the commissioners.

In executing the warrant for a sheriff's jury, it seems, that the officer is not restricted by the Rev. Sts. *c.* 24, § 18, to summoning only twelve persons to constitute the jury, but that he is thereby directed to summon a jury to consist of twelve men ; for which purpose, and in order to ensure the attendance of twelve, it is not irregular to summon fourteen.

The line of the harbor of Boston, as established by the act of 1840, *c.* 35, at a particular part thereof on the Charlestown side, was fixed at a point described as fifteen feet distant from the south corner of Gould's Wharf, and three hundred and twelve feet distant from a sea wall from which Gould's Wharf projected ; and the south corner of Gould's Wharf was found by measurement to be three hundred and two feet distant from the sea wall ; it was held, on a trial before a sheriff's jury, that the sheriff was not bound to instruct them, either that there was such an ambiguity in respect to that part of the line, that it could not be determined upon the evidence, where the line was, or that the true line was ten and not fifteen feet from the south corner of Gould's Wharf; but that the question was one of fact, to be left to the jury upon the evidence.

The Charlestown Wharf Company were authorized by the act of 1841, *c.* 35, to extend and maintain their several wharves, lying between Gray's Wharf and the Prison Point bridge, into the channel, as far as the line established by the act of 1840, *c.* 35, for the harbor of Boston, with the right and privilege to lay vessels at the sides and ends of such wharves, and to receive wharfage and dockage therefor : At the time of the passing of this act, the Charlestown Wharf Company were the proprietors of several wharves within the limits mentioned in the act, and, for a considerable distance between Warren bridge and Prison Point bridge, of a sea wall built below high water mark, and filled up behind to high water mark, and used for the purpose of landing lumber and other things upon, with pier or pile wharves about eighty feet in width, projecting therefrom towards the channel : It was held, that the sea wall, being an artificial structure, adapted to the purposes for which it was used, was a wharf within the meaning of the act, and that the proprietors were thereby authorized to extend the same along their whole front to the line of the harbor.

Where the proprietor of a wharf in the harbor of Boston was authorized by an act of the legislature to extend the same into the channel to the line of the harbor ; and, before any extension thereof, in pursuance of such act, the legislature incorporated a railroad company, with authority to locate and construct a railroad across and over the flats between such wharf and the line of the harbor ; it was held, that the act authorizing such extension operated as a grant to the proprietor of the wharf, and was not a mere license revocable at the pleasure of the legislature, and revoked by the act incorporating the railroad company.

An act of the legislature having authorized a railroad corporation to make certain erections for their road between the channels of Charles and Miller's Rivers, in a manner particularly specified in the act ; and such erections having been made accordingly, in the manner specified, whereby the course of the currents of these rivers was changed, and directed towards and upon certain wharves and flats, rendering additional sea wall and filling necessary to secure the same ; it was held,

The Fitchburg Railroad Company *v.* The Boston & Maine Railroad.

that the damage thereby occasioned to the proprietor was *damnum absque injuria*, for which he was not entitled to recover against the railroad corporation.

On a proceeding before a sheriff's jury, instituted by the Fitchburg Railroad Company for the recovery of damages occasioned by the laying out and construction of the Boston and Maine Railroad over the land, wharves and flats of the former, the respondents introduced a letter signed by the president of the petitioners, and addressed to the president of the respondents, dated the 10th of August, 1844, in the following terms : "The committee of the directors of the F. R. Co. have considered your application for a part of the flats of this company in C. for your corporation, and have come to the conclusion, that they are not prepared to dispose of any of said flats, or at this time to name any price for what the law allows you to take for your road, but that you can go on, and lay the sea wall as you propose, and fill up a sufficient width for your track, and settle all damages with Mr. James Gould, at your expense ; and the whole matter shall be settled on equitable terms hereafter." P. S. "It is understood that the wall and filling up is to be considered as above." And it was in evidence, that the respondents had subsequently built a road and wall, as alluded to in the letter; it was held, that such letter and subsequent proceeding did not prove any contract or agreement between the parties, relative to the subject thereof.

A sheriff's jury, in making up their verdict, may, if they think proper, consider each item or charge of damage separately, and state in their verdict what items they allow, and the amounts thereof, severally, and what they reject; and where the verdict is returned in this form, any item of damage, which, in point of law, is objectionable, may be remitted or deducted, without setting aside the verdict.

The Fitchburg Railroad Company having claimed damages of the Boston and Maine Railroad, for land and wharves and certain flats, (over which they were authorized to extend their wharves,) taken by the latter for their road; and the sheriff's jury, by whom the damages were estimated, having returned a verdict assessing the greater part thereof "for the land over which the said company had a right to build a pier wharf," between the sea wall and the line of the harbor, "and for the injury to other land on which the said F. R. Co. had a right to build a pier wharf;" and it was objected, that the verdict was erroneous, in giving the damages only for land over which the petitioners had a right to build a pier wharf: It was held, that though there might be some inaccuracy in the terms of the verdict, there was nothing to warrant the conclusion, that it did not include land owned by the petitioners and taken by the respondents.

JAMES GOULD, on the 15th of October, 1844, presented his petition, dated the 12th, to the county commissioners of Middlesex, requesting them to view certain leasehold premises in his occupation, and estimate the damages sustained by him, in consequence of the location and construction of the Boston and Maine Railroad over and across the same.

The petitioner represented that he was the lessee, for the term of seven years commencing on the 1st of April, 1839, of a certain wharf situated in Charlestown, being the wharf next south-easterly of Prison Point bridge, (as described in the petition,) with the right and privilege to lay vessels upon

and over a strip of flats thirty feet wide, adjoining each side and the end of said wharf, and the right to pass and repass to and from the demised premises with boats and vessels ; that he had used the same for the purposes of a lumber wharf, and had also erected thereon a limekiln and other buildings where he carried on the manufacture of lime ; and that the Boston and Maine Railroad Extension Company had located their railroad over and across the south-westerly part of the premises, and had taken and intended to take a strip of the same, five rods in width, passing directly through the limekiln and other buildings, by means whereof his wharf and premises had been rendered of little value for the purposes of a wood and lumber wharf, and of no value for the manufacture of lime.*

On this petition, the commissioners appointed a meeting at the Middlesex House in Charlestown, on the 15th day of November, then next, for the purpose of hearing the parties in relation to the prayer of the petition, and ordered notice to be given thereof to the Boston and Maine Railroad Extension Company.

The commissioners met accordingly, and the parties being present, the petitioner was allowed by the respondents to amend his petition, by adding to the description of the premises alleged therein to be injured, that he was also the lessee of a certain tract of land and flats (describing the same) next south-westerly of the Prison Point bridge in Charlestown. This amendment was filed by agreement, and was to be considered as inserted in the petition.

The commissioners then proceeded to view the premises, and to hear the parties, and, having heard them, estimated the damages of the petitioner at $2500, to be paid to him by the respondents, with costs, and continued the petition to their next meeting. At the next meeting, held on the first Tuesday of January, 1845, the petitioner, being dissatisfied with

---

* The localities, referred to in this case, will be found delineated on the map, inserted at page 9.

the commissioners' estimate, applied to them to issue a warrant for a jury to assess his damages. The commissioners granted the request, and a warrant was issued, and duly executed and returned by the sheriff, with a verdict of the jury estimating the petitioner's damages at the sum of $3391·79, which was presented to the court of common pleas, at the September term, 1845, for acceptance. The respondents objected to the verdict, for several reasons, and, amongst others, because no notice was given to the proprietors of the estates leased to the petitioner, pursuant to the provisions of the statute; and, therefore, that a judgment entered on the verdict would be no bar to further litigation, in which the value of the same property would again come in question; and because the verdict did not conform to the provisions of the Rev. Sts. *c.* 24, § 50, which require, in case any party interested in the estate has sustained damage, that the verdict shall find and set forth the total amount of damages sustained by the entire estate, and shall then apportion the same among the parties interested. The court of common pleas, after hearing the parties on the respondents' objections, ordered the verdict to to be set aside and the case to be remanded to the commissioners.

The proceedings of the court of common pleas, in setting aside the verdict, being certified to the county commissioners, at their meeting on the first Tuesday of January, 1846, they, thereupon, at the request of the petitioner, ordered his petition for a jury to be dismissed, and his original petition, for an appraisement of damages against the Boston and Maine Railroad Extension Company, to be brought forward and reinstated on their docket. They then passed an order, in the following terms: "It having been certified, &c.; and now at this meeting the petitioner having requested the commissioners to estimate his damages as stated in his first petition; and it appearing from the same, and being proved by other evidence, that the petitioner is only entitled to an estate for years in the premises described in the petition, and that the reversion in fee of a part of the premises belongs to the

Fitchburg Railroad Company, and of the other part to the commonwealth of Massachusetts : It is ordered, that the petitioner give the Fitchburg Railroad Company and the commonwealth notice of the pendency of his petition, by serving the clerk of the Fitchburg Railroad Company, and also the secretary of the commonwealth, with an attested copy of the petition and this order thereon, thirty days at least before the meeting of the commissioners, to be holden by adjournment from this meeting, &c., on the fourth Tuesday of March next, that such parties may then and there appear, if they see cause, and become parties to the proceedings under the petition."

At the adjourned meeting of the commissioners, on the fourth Tuesday of March, 1846, the commonwealth and the Fitchburg Railroad Company, having been duly notified according to the order of the commissioners, appeared and became parties to the proceeding in the matter of Gould's petition, the former by James Dana and George W. Warren, and the latter by E. R. Hoar, their attorney ; and the commissioners thereupon appointed a meeting to be held on the 25th day of May, then next, for the purpose of viewing the premises, and hearing the parties, and directed notice thereof to be given to all persons and corporations interested, by serving the clerk of the Boston and Maine Railroad with a copy of Gould's petition and of the commissioners' order thereon, fourteen days before the time appointed for the meeting.

The commissioners met, according to their appointment, on the 25th of May, 1846, for the purposes above stated. At this meeting, two only of the commissioners attended; the third being absent, and his place supplied by one of the special commissioners. The return of the proceedings stated, that Charles Tower, esquire, one of the special commissioners, was present and acted instead of Ebenezer Barker, esquire, " one of the said county commissioners, who declined to sit on account of circumstances existing between him and the parties, which, in his judgment, rendered it improper that he should do so." The commonwealth appeared by Samuel D.

Parker, esquire, "attorney therefor within and for the county of Suffolk, authorized and instructed thereunto by its governor, under a resolve of the legislature thereof;" and the other parties by their respective attorneys.

The Fitchburg Railroad Company then filed with the commissioners a written statement of their claim for damages against the Boston and Maine Railroad, (with which the Boston and Maine Railroad Extension Company had then been united and merged,) embracing not only the property described in Gould's petition, but also other property which they alleged had been injured by the location of the respondents' road. This statement was filed by consent, and under an agreement signed by the parties, and filed with the commissioners, that, as it was desirable that the whole claim of the Fitchburg Railroad Company for damages against the respondents should be determined and adjusted at the same time, the respondents should take no exception to the claim, for the reason that it had reference to other property than that included and described in Gould's petition ; but that the commissioners, and a jury, should one be summoned in the case, might adjudge all damages specified in the claim, to which the company were legally entitled under the proceeding upon Gould's petition, and under the claim then filed, in the same manner, and to the same extent, as if the claim of the company thereto were set forth in a separate petition regularly before the commissioners or a jury.

The petitioner Gould filed a statement with the commissioners, at the same meeting, withdrawing that portion of his claim for damages, which was set forth in the amendment to his original petition, for the reason, that the premises therein described were the property of the commonwealth, and comprised all the property described in his petition, in which the commonwealth had any interest. Gould, at the same time, waived all claim for damages against the respondents, on account of his having been the lessee of the premises described in the amendment, and requested the commissioners to award him no damages therefor.

The attorney for the commonwealth also filed a paper

with the commissioners, consenting, on behalf of the commonwealth, to Gould's withdrawal of his claim for damages as the lessee of the commonwealth, and (without intending thereby to waive the commonwealth's claim for damages under a distinct petition then pending before the commissioners) withdrawing the commonwealth's appearance, or right to appear, in the proceedings on Gould's petition.

By the arrangement thus made among the parties, and carried into effect with the sanction of the commissioners, the case presented a claim of damages by the Fitchburg Railroad Company for land taken by the respondents, and a claim of damages by Gould, for an injury occasioned thereby to his leasehold estate in a part of the same premises.

The Fitchburg Railroad Company, in the statement of their claim filed as above mentioned, represented, that since the 16th of March, 1844, they had been and then were seized in fee of a certain parcel of land, wharves and flats, in Charles- 'own, bounded south-easterly by Warren Avenue and Warren 'ridge ; southerly and south-westerly on Charles and Miller's Rivers, by the line known as the " commissioners' line ; " north-westerly by land and flats belonging to the commonwealth of Massachusetts ; and westerly and north-westerly by Front Street in Charlestown ; with a right to lay vessels at the ends of all wharves built, or which might be built, on the premises, and the right to pass and repass to and from the same with boats and vessels : — that the respondents had laid out their railroad across the south-westerly part of the premises, five rods wide, and had taken for that purpose a portion of the petitioners' land, wharves and flats, containing twenty-six thousand four hundred square feet ; that four thousand five hundred and eleven square feet of the land so taken constitued a part of a wharf described in Gould's petition as taken by the respondents, and when taken was held by Gould, with a right in the flats and docks adjoining, as stated in his petition, under a lease which expired on the 1st of April, 1846 : — that by the taking of their land, another part of the premises first mentioned, namely, a piece bounded on the

6 *

north-west by land of the commonwealth, north-easterly by the land taken by the respondents, and south-westerly by the commissioner's line, containing about seventeen thousand five hundred and thirty-six square feet, was much injured and reduced in value, and separated from all approach from the other land of the petitioners : — that by the taking of their land as aforesaid, and by the construction of the respondents' road, all the remainder of the premises first described were injured and lessened in value by being divided thereby in an inconvenient form, and by being cut off from all free and convenient approach by water, as they had before enjoyed ; that by the construction of the railroad, and the building of the draw therein nearest the first described premises, the action of the current of Miller's River, and the tides therein, had been altered, so as to injure and endanger the washing away of the first described premises, and to render insecure any sea wall erected or to be erected thereon : — that by an act passed on the 25th of March, 1845, (*St.* 1845, *c.* 224,) the respondents were authorized to build a sea wall, and enclose and make solid the flats between Miller's River and Charles River, for the purposes of their road, to the extent therein limited, and were required to open and maintain a new and sufficient channel, for the waters and tides of Miller's River, westerly of the enclosure ; and that by the erection and enclosure, and by the opening and maintaining of the new channel, the property first described of the petitioners was endangered and diminished in value, and the channels and approaches by water thereto were liable and likely to be filled up, obstructed and destroyed.

The commissioners, after viewing the premises and hearing the parties, estimated Gould's damages at the sum of two thousand five hundred dollars, and the damages of the Fitchburg Railroad Company at the sum of forty-six thousand four hundred and forty-four dollars ; which sums they ordered the respondents to pay to the petitioners, respectively, with costs to be taxed by the commissioners. The commissioners stated, in their return, that no damages were assessed by them for the com-

The Fitchburg Railroad Company *v.* The Boston & Maine Railroad.

monwealth, the claim therefor having been withdrawn; and that in estimating the damages, they had conformed to and observed the agreements of the parties. The return was dated on the 1st of June, 1846.

The respondents, being dissatisfied with the estimate of the commissioners, presented their petition for a jury, on the 2d of July, 1846. They alleged therein that all the anterior proceedings, (which they recapitulated and the record of which they prayed might be considered as part of their petition,) and the last mentioned estimate of damages and order thereon, were irregular, oppressive and illegal; that they were aggrieved and dissatisfied with the same; and that for want of a more direct remedy they applied for a jury to be awarded for the purposes and agreeably to the provisions of the statutes for such case made and provided.

The commissioners thereupon ordered the clerk to issue a warrant, directed to the sheriff, for the purposes mentioned in the respondents' petition, at such time as they should call for it; and the same was called for by them and issued accordingly, in the usual form, on the 3d of October, 1846. The parties had previously entered into the agreement, stated on page 35, in the case of the commonwealth against these respondents, for proceeding in the execution of the warrant, after the expiration of the time limited therein, and returning the verdicts, when prepared, as of the September term of the court of common pleas.

The sheriff proceeded to execute the warrant, and caused fourteen persons, namely, five from Charlestown, four from Somerville, and five from Cambridge, those being the "three nearest towns not interested in the question," to be drawn and returned as jurors, who were duly summoned and attended before the sheriff, at the Mansion House in Charlestown, on the 2d of November, 1846, for the purposes mentioned in the warrant. Twelve of the persons so returned were then empanelled, with the consent of the parties, under a warrant directed to the sheriff for the assessment of damages in the case of the commonwealth against these respondents. The

jury so empanelled were occupied with that case until the 5th of November, when two of the five returned from Charlestown, being stockholders in the Fitchburg Railroad Company, were set aside by the sheriff, as interested, and the remaining twelve were empanelled and sworn, and proceeded to the trial of this cause, and after viewing the premises and hearing the parties agreed upon a verdict. The sheriff returned the verdict, together with a certificate of such of his rulings and instructions to the jury as the parties requested him to certify, and a statement of certain documentary and other evidence, which he was requested by the respondents to make a part of his return, to the court of common pleas, by whom the verdict was accepted. The respondents then appealed to this court.

The jury, by their verdict, assessed the whole damages sustained by both the petitioners, Gould and the Fitchburg Railroad Company, at the sum of forty-three thousand four hundred and sixty-four dollars and ten cents, which they apportioned between them, in proportion to their several interests, and the damages respectively sustained by them.

The award of damages in favor of Gould, and the exceptions taken by the respondents to the rulings and instructions of the sheriff to the jury in his case, became immaterial, in consequence of a settlement between him and the respondents, which took place after the appeal and before the hearing in this court.

The verdict, so far as it relates to the claim of the Fitchburg Railroad Company, was as follows: —

" And to the said Fitchburg Railroad Company, the sum of forty thousand four hundred and fifty-one dollars and ninety-eight cents ; from which sum the jury deduct a claim of the said Boston and Maine Railroad Company, amounting to seventeen hundred and seventy-five dollars and ninety-eight cents, by agreement of parties ; leaving a balance to the said Fitchburg Railroad Company, of thirty-eight thousand six hundred and seventy-six dollars, for their damages as aforesaid. Of which the sum of thirty-eight thousand one hundred and

seventy-six dollars, together with one thousand seven hundred and seventy-five dollars ninety-eight cents, the amount of claim deducted as aforesaid, is for the land over which the said company had a right to build a pier wharf, which was taken by the said Boston and Maine Railroad, between the sea wall and the commissioners' line, and for the injury to other land on which the said Fitchburg Railroad Company had a right to build a pier wharf. And the sum of five hundred dollars is for the injury done to the land of the said Fitchburg Railroad Company, by the diversion of the current caused by the bridge, pier and draw of the said Boston and Maine Railroad."

The questions, upon which the cause was argued in this court, arose upon sundry objections taken by the respondents to the anterior proceedings, as hereinbefore set forth, and to the form of the verdict, as above stated, and upon the rulings and instructions of the sheriff to the jury, as certified by him.

The respondents contended, that it was open to them to object to the anterior proceedings, on the ground, among others, that all those proceedings appeared on the record of the adjudication of the court of common pleas, from which the respondents appealed. The record of that court, a copy of which was in the case, contained a recital of the petition of the respondents for a jury, in which all the anterior proceedings were summarily set forth, with a prayer that the record thereof, in full, might be considered as a part of the petition ; also a statement of the verdict as rendered by the jury ; and, lastly, a statement of the acceptance of the verdict by the court of common pleas, and the appeal therefrom · by the respondents.

The respondents objected : 1st. That the proceedings of the commissioners, on Gould's petition, were irregular ; 2d. That the board, when assessing the damages, was not properly constituted ; 3d. That five of the jurors summoned were taken from Charlestown ; 4th. That fourteen jurors, instead of twelve, were summoned ; 5th. That the case did not go

to the same jury with that of the commonwealth, pending at the same time, against the same respondents ; and, 6th. That the verdict was erroneous in awarding the principal part of the damages for the land over which the petitioners had a right to build a pier wharf.

The rulings and instructions of the jury, which were objected to, were as follows : —

1. The legislature, by an act "concerning the harbor of Boston," passed on the 17th of March, 1840, (*St.* 1840, *c.* 35,) established certain lines therein described as the lines of the harbor of Boston, beyond which no wharf or pier should ever thereafter be extended into and over the tide waters of the commonwealth. The fourth section established the lines on the Charlestown side of the harbor, commencing at the southwest corner of the most westerly navy yard wharf, and thence extending westerly to a point in the Prison Point bridge. This line, so far as it is material to be here stated, commenced at "the south-east corner of the wharf belonging to the Charlestown Land and Wharf Company, nearly opposite a passage way ; thence north-westerly, about nine hundred and twenty feet, to a point in range with the east side of Fifth Street, being two hundred and eighty-four feet westerly from the sea wall, measured on a line in range with said east side of Fifth Street ; thence, north-westerly, about five hundred and ninety feet, to a point fifteen feet from the south corner of wharf B, occupied by Charles Gould, as a lime wharf, which point is three hundred and twelve feet from the sea wall of the Charlestown Land and Wharf Company ; thence, north-westerly, about four hundred feet to Prison Point bridge, at a point which is eighty-six feet easterly from the east side of the draw in said bridge, and three hundred twenty-three feet south-westerly from the sea wall, measuring along the south-easterly side of said Prison Point bridge."* The sixth section of the act provided, that no wharf or pier, then

---

* The names both of Gould and the wharf company are here incorrectly given. The corporate name of the latter is the "Charlestown Wharf Company."

erected, on the inner side of the line, should be extended further towards the same, than such wharf or pier then stood, or might have been lawfully enlarged or extended, before the passing of the act, without leave being first obtained from the legislature.

At the time this act was passed, the premises in question were the property of the Charlestown Wharf Company ; a portion thereof being then under a lease to Gould, and occupied by him, as set forth in his petition.  By an act passed on the 27th of February, 1841, (*St.* 1841, *c.* 35,) the company, their successors and assigns, were authorized, under certain limitations, to extend and maintain their several wharves, amongst others, those lying between Warren bridge and Prison Point bridge, into the channel, as far as the line established by the act above mentioned, with the right and privilege to lay vessels at the sides and ends of said respective wharves, (so much of the same as might be constructed in the channel to be built on piles,) and receive wharfage and dockage therefor.  In the year 1843, before the incorporation of the Boston and Maine Railroad Extension Company, the Fitchburg Railroad Company became the owners of the premises described in their petition, by a purchase and assignment thereof, with all the rights belonging to the grantors, under the acts above mentioned, from the Charlestown Wharf Company.

The railroad of the respondents having been laid out in part over the flats, upon and over which the petitioners were authorized by the last mentioned act to extend their wharves, to the line of the harbor, or "commissioners' line," as it was called, and the petitioners claiming damages for the flats so taken, it became important to ascertain the extent of their right thereto under the statute, and for that purpose to determine the course and position of the line of the harbor, relatively to the petitioners' other estate.

The petitioners contended, that the line run at the distance of fifteen feet from the south corner of Gould's wharf, as stated in the act, and as laid down on the plans exhibited by them to the jury.  The respondents introduced evidence, that

the south corner of Gould's wharf was three hundred and two feet distant from the sea wall, which would make the line contended for by the petitioners three hundred and seventeen feet from the sea wall, and thereupon insisted, either that the line was at that part of it incapable of determination, or that it was five feet nearer the shore than it was alleged to be by the petitioners. This discrepancy was the subject of the first exception, which was thus certified by the sheriff : —

" In the course of the trial, it having been proved, that the south-east corner of Gould's wharf was three hundred and two feet from the old sea wall of the Charlestown Wharf Company, mentioned in the statute of 1840, *c.* 35, § 4, and that the commissioners' line laid down on the plans, and claimed by the petitioners, was fifteen feet in advance of said corner ; the respondents requested me to rule, that there is such an ambiguity in respect to that part of the commissioners' line, that it cannot now be determined, upon the present state of the evidence, where the line is, or, secondly, that the true line is five feet nearer the shore, and I refused so to rule."

2. It appearing in evidence, that the sea wall of the Charlestown Wharf Company, between Warren bridge and Prison Point bridge, was built at different distances, below high water mark, and above low water mark, and was filled up behind and used for landing lumber and other things thereon, and that the pier or pile wharves, projecting therefrom towards the channel, were about eighty feet wide ; the respondents requested the sheriff to instruct the jury, that, by the act of 1841, *c.* 35, the wharf company and their successors and assigns were not authorized to advance the sea wall, but only the projecting wharves, by a pier wharf, to the commissioners' line ; and, also, that the act, as a license to the company, was revocable by the legislature, before the company had acted under it, and was in fact revoked, as to that part of the flats taken by the respondents, by their act of incorporation.

The petitioners requested the sheriff to instruct the jury, that if they were satisfied of the existence of a wharf or wharves extending from the land of the commonwealth

towards Warren bridge, as far as the lands extended for which damages were claimed, and between Warren bridge and Prison Point bridge, prior to and at the time of the passing of the act of 1841, *c.* 35, that the Charlestown Wharf Company were empowered by that act to build a pier wharf to the harbor line, as far as such wharf or wharves extended.

The respondents objected to the proposed instruction, on the ground, among others, that it did not discriminate, as the act of 1840, *c.* 35, referred to in the act of 1841, *c.* 35, did, between the wharves and sea wall then existing, and requested the sheriff to instruct the jury, that the right granted to the Charlestown Wharf Company by the last named statute, to extend their wharves on piles to the commissioners' line, embraced only the wharf then existing, in distinction from the sea wall mentioned in the former statute, and did not extend to the sea wall, so as to authorize pile wharves to be built into the channel in front of it, on which there was then no projecting wharf.

The sheriff thereupon gave the instructions requested by the petitioners, and declined giving those requested by the respondents, with reference to the extent of the authority granted by the act of 1841, *c.* 35.

3. The petitioners having introduced evidence tending to show, that the draw and piers of the respondents' bridge were so near the petitioners' premises, and had such an effect upon the currents, as to cause damage to the petitioners, the respondents requested the sheriff to instruct the jury, that if the draw and pier were constructed in conformity with the requisitions of the act of 1845, *c.* 224, (see page 66,) the petitioners were not entitled to recover any damages arising incidentally therefrom.

The sheriff did, thereupon, so instruct the jury, but at the same time, further instructed them, that if the draw and piers of the respondents' railroad were constructed according to the act, yet if the natural channel of the river, and the course of the currents, were thereby directed and turned upon the wharves and flats of the petitioners, washing away the soil

or endangering the wharves or sea wall, or making additional piling or ballasting necessary for their security, the erection of such draw and piers was a just ground for damages.

4. The respondents gave in evidence a letter addressed by the president of the Fitchburg Railroad Company to the president of the Boston and Maine Railroad, dated the 10th of August, 1844, in the following terms: "The committee of the directors of the Fitchburg Railroad Company have considered your application for a part of the flats of this company in Charlestown, for your corporation, and have come to the conclusion that they are not prepared to dispose of any of said flats, or at this time to name a price for what the law allows you to take for your road, but that you can go on, and lay the sea wall as you propose, and fill up a sufficient width for your track, and settle all damages with Mr. James Gould at your expense ; and the whole matter shall be settled on equitable terms hereafter." A postscript was added: "It is understood that the wall and filling up is to be considered as above."

The respondents thereupon requested the sheriff to instruct the jury, that this letter, in connection with the evidence of the subsequent building of the road and sea wall therein referred to, proved such an agreement or contract between the parties relating to the subject matter in dispute, as to bar the petitioners from proceeding in this form for the recovery of damages.

The petitioners objected to this proposed instruction, on the ground, among others, that there was no proof of the terms of the application to which the letter purported to be an answer, or of any reply being made thereto ; that the letter did not contain or prove any contract ; nor was there any proof that the writer was authorized to make any contract on the subject.

The sheriff declined to instruct the jury as requested.

The petitioners having stated their claims for damages in separate charges or items, for the purpose of having the questions of law severally arising on each distinctly presented,

requested the sheriff to instruct the jury, that if they should should see fit, they could find the items separately. The sheriff thereupon instructed the jury, that they were first to find the total amount of the damages sustained by the two claimants, Gould and the Fitchburg Railroad Company, and then apportion the same between them, in proportion to their several interests and the damages respectively sustained by them; and that the jury would then be at liberty, if they should see fit, to state in their verdict the items of damages, with the amounts, as they should find them, against each.

*B. R. Curtis* and *T. Farrar*, for the respondents.

*R. Choate* and *E. R. Hoar*, for the petitioners.

SHAW, C. J.* The proceedings in this case come before the court by way of appeal from a decision of the court of common pleas, accepting the verdict given by a sheriff's jury for damages against the respondents for land taken for their railroad. This verdict was given in favor of James Gould, and of the Fitchburg Railroad Company, who were the petitioners for damages against the respondents. Since the cause was brought into this court, the claim of Gould has been settled, and the proceedings, so far as he is concerned, are terminated and discontinued ; and they are now no longer to be brought under consideration, except so far as it may be necessary to consider them, in deciding upon the regularity or legality of the proceedings in relation to the other petitioners, the Fitchburg Railroad Company.

This case nominally comes before this court of appeal from the court of common pleas, upon matters of law apparent upon the record ; although it appears, in fact, that the judgment of that court was not passed upon it; but that the hearing before the sheriff's jury was had by consent, and the verdict made up, after that court had adjourned, under an agreement of the parties to waive all exceptions to the irregularity of the course pursued ; an irregularity much more

---

* WILDE, J., and FLETCHER, J., did not sit in this cause.

considerable than the most of those which have been urged on our attention as sufficient to quash the proceedings.

I. In the first place, we have to remark, that the record of the court of common pleas, a copy of which is in the case, appears to us to be entirely irregular. This is not, perhaps, a matter of surprise, when it is considered that the case was entered in the court of common pleas after the court had adjourned, and when the clerk was left without form or precedent, and without the aid or direction of the court, to make up the record. This kind of proceeding is comparatively new, — founded on recent statutes, — so that there are no settled and established forms to guide the recording officer.

The court are of opinion, that the record is irregular in setting forth, as part of the record of the court of common pleas, all the anterior proceedings of the county commissioners. For reasons set forth in the case of *Walker* v. *Boston & Maine Railroad*, (see ante, page 15,) we think that the proceedings in the court of common pleas begin with the return of the sheriff of his warrant, and of his doings under it as set forth in his return, including his decisions and instructions to the jury, and their verdict.

The mistake, on the part of the clerk, is a natural one; he is the recording officer of both courts, the county commissioners, and the court of common pleas, and has the records of both tribunals officially before him, and in the absence of any particular directions from the court, he might naturally suppose, that it would be convenient to have a full and entire statement of the proceedings of both in his record of the action of the court of common pleas, in affirming or setting aside the verdict.

If this were merely an irregularity in point of form, it would be of little importance. A more exact and better form might be adopted hereafter, and no great inconvenience would follow. But the respondents in this case have assumed, that all the doings of the county commissioners, from the first application of a tenant for years, for the assessment of his

several damages, to the summoning in of the other parties, the assessment of the damages of those parties, even irregularities as to times of adjournment, and other supposed errors and mistakes of the minutest character, down to the return of the verdict to the court of common pleas, are open on this record; and if any irregularity can be shown, it is a case for setting aside the entire proceedings.

But if parties were confined to taking their exceptions in proper time and due order before the commissioners and before the court of common pleas, instead of their being opened here, in the first instance, it might appear, that acts which now seem to have been irregular passed by consent, or that exceptions were waived; or the objections may be of such a nature that if they had been taken seasonably, the supposed errors might have been corrected. It is a most important principle, in the administration of justice, that, in order to ensure regularity and give litigant parties every advantage to which they are entitled, objections to irregularities will be received and sustained, if seasonably made; yet if the party entitled to take such objections passes them by, and proceeds to the further consideration of the case, he shall be deemed thereby to have waived them; otherwise, a party, knowing of defects of form and technical exceptions not affecting the substantial merits of the case, may lie by and take his chance for a favorable judgment, with a purpose and a power of defeating the judgment, should it be against him.

From this view, it is obvious, that if all the doings of the commissioners, of the sheriff and jury, and of the court of common pleas, were opened before us on this appeal, great injustice might be done, either on the one hand by overlooking manifest errors and encouraging a laxity of practice, or on the other by setting aside judgments upon nice objections in law not affecting their substantial merits. This would be contrary to the policy of the law, which, whilst it inculcates a strict and careful practice in all proceedings affecting the rights of parties, will not suffer judgments to be reversed for any defects or imperfections in matter of form, though found

7*

in the record.    Rev. Sts. *c.* 100, §§ 23, 24.    So, as to proceedings before the commissioners, they can only be reversed by a writ of *certiorari* issued upon a petition, upon which the merits are fully investigated on broad and equitable principles; and no such writ will be granted, if substantial justice is done, or if the judgment has been carried into execution, in whole or in part, so that quashing it would lead to injurious consequences.

And so, we think, that where it is provided, that when the verdict of a sheriff's jury is brought before the court of common pleas, they may set the same aside for good cause, it must be for some cause affecting the legality, the justice and the merits of the case.    If such adjudication is founded on matter presented by the warrant, return and verdict, it is matter of law apparent on the record, and will be brought before this court for revision by an appeal ; but if it is cause shown by evidence *aliunde*, including in this designation the record of the commissioners, if adduced for the purpose of showing any fact affecting the merits, it is matter of fact, on which the decision of the court of common pleas is conclusive.    If either party has matter of exception to any decision or adjudication of the court of common pleas in matter of law, it must be either especially stated in the decision or adjudication itself, or in a bill of exceptions filed and allowed by that court.

1. The first objection taken to this verdict is, that the proceedings upon the petition of James Gould were irregular. We are of opinion, that this objection is not open; that it is not apparent upon any part of this record ; and, for the reasons already given, that it is not before this court.    But as the objection was much relied upon, and was urged upon the consideration of the court, it may be proper to consider whether it would avail the respondents, if more distinctly presented on the record.

The proceedings, which we are now revising, commenced with the petition of the respondents, of the 2d of July, 1846, to the commissioners, setting forth the anterior proceedings

and praying for a jury to revise the appraisement of damages made by the commissioners. In this petition, they set forth, that Gould made application to the commissioners to assess his damages; that they made an assessment; that Gould expressed his dissatisfaction and prayed for a jury; that a warrant for a jury was issued accordingly; that a verdict in his favor was returned; and that this verdict was set aside by the court of common pleas, and the fact certified back to the commissioners. It appears, that this verdict was objected to by the respondents, on the ground, amongst other things, that Gould was a tenant for years of the property alleged to be damnified, and that the commonwealth and the Fitchburg Railroad Company, respectively, were the owners of the reversions, in different parts thereof, and ought to have been made parties. The petition then further sets forth, that the commissioners ordered notice to be given to the commonwealth and to the Fitchburg Railroad Company, who appeared; that Gould's petition for a jury was set aside or dismissed; that his first petition for an allowance of damages was brought forward; that the commissioners then estimated damages for Gould, for that part of the estate which he held as tenant for years of the Fitchburg Railroad Company, and also damages for the Fitchburg Railroad Company for the injury to their reversionary interest; the application of Gould for damages for that part of the estate which he held of the commonwealth being withdrawn. Upon this appraisement of damages. in behalf of Gould and of the Fitchburg Railroad Company, these respondents filed their protest, stating that this last estimate of damages and order for payment thereof were irregular, oppressive and illegal, and that they were aggrieved and dissatisfied with the same, and that for want of a more direct remedy, they applied for a jury, agreeably to the statute for such case made and provided.

Several remarks arise upon this petition. By setting forth these proceedings, knowing of the irregularities, if there were any, and presenting a petition for a jury, in the nature of an appeal to another tribunal, without taking any exception, the

respondents admitted the regularity of the proceedings and waived any exceptions to them.   If they intended to except to the proceedings, in that stage, the remedy was by an application for a *certiorari* to set them aside.

But were these proceedings irregular?   The ground now insisted upon in argument is, that when the verdict on Gould's claim alone was set aside, and the case sent back to the commissioners, they had no authority to dismiss Gould's petition for a jury, and to go back to his application for damages, and summon in the commonwealth and the Fitchburg Railroad Company, to be heard in that stage of the proceedings.   If a new order for a jury had been made without summoning in these reversioners, the verdict would have been liable to the same objection as before, on exceptions taken by the respondents, and upon which, as it is stated in argument, and may have been so in fact, the verdict was set aside.   But it is said, that these reversioners could not be summoned in to have their damages estimated by the commissioners; and that they could only go directly to the jury, in the first instance.   This is alleged to be an express duty enjoined on the commissioners by statute.

If this is so, it is contrary to the general policy of the statutes, which regard the assessment of damages, in the first instance, as made by the commissioners; and, by which, it is only when one or the other party is dissatisfied with the estimate, that the more cumbrous and expensive remedy in the nature of an appeal to a jury is provided.   This point, therefore, requires examination.   The statute relating to railroads (Rev. Sts. *c.* 39, § 56) provides, that railroad corporations shall be liable to pay all damages occasioned by the laying, out, &c., of their roads, and that such damages shall be estimated by the commissioners, in the manner provided in the case of laying out highways.   The next section (§ 57) provides, that either party dissatisfied with the estimate of the commissioners may apply for a jury, at that or the next regular meeting, and the like proceedings shall be had thereon, as are provided in the case of laying out highways.   The fifty-

eighth section limits the time for making application to the commissioners, with some exceptions, to three years. These are the leading provisions in the railroad act, in regard to the liability for damages and their assessment and recovery; the mode of proceeding is referred entirely to the statute relating to highways. Now when it is said in the statute that "like proceedings shall be had," it must mean similar proceedings where the cases are alike.

The respondents, recurring to the highway act, Rev. Sts. *c.* 24, rely upon §§ 48, 49, 50, 51, which provide, that where several parties have distinct estates and interests in the land taken, as where there is a tenant for life or years, with remainders and reversions, the damages shall be appraised as of the entire estate; and also that when one of such parties shall apply for a jury, all the others may become parties, and for that purpose may be summoned before the commissioners. These sections then direct that the whole matter shall be determined by one verdict, appraising the whole damages, and apportioning them among the several parties according to their respective estates and interests, and that the verdict shall be binding and conclusive upon all who are parties or have notice; making no provision for a previous appraisement of damages by the commissioners, in behalf of those who are thus summoned in.

But, before applying these provisions, relating to damages for land taken for highways, literally and strictly to the case of persons entitled to damages under the railroad act, it is necessary to consider the difference between the two classes of cases, and especially the difference in the manner of commencing proceedings for the recovery of damages.

By the highway act, Rev. Sts. *c.* 24, § 11, it is made the duty of the county commissioners, in the first instance, and without any application therefor, in laying out a highway, if any person has sustained damage, to estimate such damage and return it with their location. The twelfth section directs, that such damages shall be estimated severally, and apportioned among the persons having different interests, and re

quires the commissioners to make return of such apportion-
ment.    The thirteenth section provides for a jury, in beha'f
of any person aggrieved by the doings of the commissioners,
in the estimation of his damages.    The provisions before
cited provide what shall be done in regard to several parties
having different interests when it comes before the jury.

Here, then, it is to be considered, that before proceeding
to lay out and locate a highway, the commissioners are to give
notice to all persons interested of the time and place, amongst
other things, to make their claims for damages, to be returned
with the location.    This extends to all persons whose lands
are traversed by the highway or otherwise damnified, whether
general owners, or having particular estates and limited inter-
ests therein.    It follows, therefore, that every person's claim
for damages has been passed upon by the commissioners, and
allowed or disallowed, on the return of the location ; and
when a jury is prayed for, no further estimate by the com-
missioners remains to be made for any party ; and when
application for a jury is made by a tenant, nothing more
remains to be done, than to summon in the other parties to go
before the jury.

But the course of proceeding is quite different in the case
of railroads.    The location is not made by the county com-
missioners, but by the corporation ; and, therefore, no return
of damages is made with the location.    The statute (Rev.
Sts. *c.* 39, § 55) contemplates, that the railroad corporation
may purchase any land necessary for the making of their road ;
and it is only in the event of their not being able to obtain it
by agreement with the owner, that the damages are to be
estimated and determined by the county commissioners.

Then as to the mode of obtaining an estimate of damages ;
under the highway act, no application of the owner to the
commissioners in the first instance is necessary.    By the
railroad act, (Rev. Sts. *c.* 39, § 56,) application must be made
to the commissioners by the corporation or by the owner, and
by § 58, such application may be made at any time within
three years from the time of taking the land.    So, in the

application for a jury; in the case of a highway, it must be made at the meeting at which the location is returned, or the next succeeding meeting. But by the railroad act, (§ 57,) it must be made at the meeting at which the estimate of damages by the commissioners is completed and returned, or at the next regular meeting. So it follows, that whilst an application for a jury, in the case of highways, must necessarily be made within a few months after the location of the highway, it may be postponed for several years, in the case of railroads; though, in both cases, it is made promptly after the estimate of damages is made by the commissioners. It is in the nature of an appeal from their decision.

We have already suggested, that the whole scope of these acts implies and assumes, that the action of the jury is regarded as a revision of the estimate of damages by the commissioners. The Rev. Sts. *c.* 39, § 62, provide, that the corporation may tender the amount awarded by the commissioners, and if the owner afterwards proceeds to call a jury, it shall be at the peril of costs.

It therefore appears to us, that the difference between the two classes of cases warrants and requires some difference of proceeding, under the direction that "like proceedings" shall be had; and, therefore, that when parties, whose damages have not been estimated, are summoned in, their damages are first to be estimated by the commissioners, before the case is sent to a jury. This course seems obvious, and to arise by necessary implication, when the existence of such distinct interests is made known to the commissioners, before any warrant for a jury issues.

But it is contended, that when a warrant had once issued, on the application of Gould, although the verdict was set aside, and the case sent back to the commissioners, they were not at liberty to discharge the order for a jury made on his application, and to go back to his original application to assess damages. If it was within their jurisdiction first to estimate the damages for the Fitchburg Railroad Company, as reversioners, they must discharge the prior estimate made by them,

in order to comply with the positive injunction of law, to appraise the estate as a whole and apportion the damages. Perhaps, by this mode, Gould's proportion might have varied from the original estimate, as made independently. If they had authority to do the thing, as no mode of proceeding is directed, we do not see why the form adopted was not a suitable and convenient one, to discharge the former order for a jury on his separate claim, and proceed to consider the claims of the parties as on the original petition.

But without deciding this point absolutely, we are of opinion, that the respondents could not object to it. If any body could object to it, it was Gould. The provision, that where there are leases and other distinct rights and interests in an estate, the whole shall be appraised and apportioned, is a rule manifestly prescribed for the security and benefit of those who are liable to pay damages. Without it, they would be deprived of the benefit of the mathematical rule, that all the parts are equal to the whole. Where there are several terms, longer or shorter, partial and derivative interests, if each were severally appraised by different juries, there would be danger that the aggregate of the parts would exceed the whole, to the injury of the respondents. Whether, therefore, Gould could or could not have objected to the course adopted by the commissioners, the respondents could make no such objection; and, as against them, there was no error in this respect, which they can set up against the claim of the Fitchburg Railroad Company who were thus summoned in.

2. It is objected, that the board of county commissioners was not duly and legally constituted. For reasons given in the case of Walker against these respondents, (see page 19 ) this exception is not now open. If the board was not regularly constituted, the respondents, by proceeding, waived the objection. *Ipswich* v. *Essex*, 10 Pick. 519.

3. An objection was taken, that the jurors were not rightly summoned, there being five from Charlestown. This was an exception to the jurors from Charlestown; had it been made at the time, others might have been summoned.

4. Another objection to the jury was, that the sheriff summoned fourteen jurors, whereas the law requires him to summon a jury of twelve men. The provision of the statute (Rev. Sts. *c.* 24, § 18) seems to us no absolute restriction to his summoning only twelve jurors, but a direction to summon a jury to consist of twelve. The term jury does not necessarily imply twelve men. There are statutes, as in the case of coroners' inquests, and some others, which provide for a jury to consist of less than twelve persons. Some regard is to be had to the usages of courts, and we believe it is common in all courts, in order to ensure the attendance of twelve qualified jurors, to summon a few over the number, to provide for sickness, absence and other contingencies. But if it was an irregularity, it was waived by proceeding.

5. A further objection was, that this cause did not go to the same jury with a previous one against the same respondents, because one of the jurors, who sat in the former, being interested in this, was set aside and another substituted. It would be difficult to say, that this was not the same jury, but the objection is not apparent on the record, and not open on this appeal.

II. Several questions were raised and discussed, respecting the correctness of the directions and instructions of the sheriff to the jury. All those which relate to Gould's claim are passed over and are not now in question ; the proceedings of the several claimants being in their nature several. The Fitchburg Railroad Company were rightly before the court, after they were summoned in by the commissioners, and brought before the jury by the petition of the respondents.

1. The first direction, which was excepted to, turned upon the question, what was the true course and place of the commissioners' line of the harbor of Boston ; to which, under certain limitations, the petitioners, as the assignees of the Charlestown Wharf Company, were authorized to extend their line. The statute of 1840, *c.* 35, establishing the line of the harbor of Boston, fixes it at the place in question at a point fifteen feet from the south corner of Gould's wharf, and three

hundred and twelve feet from the wall of the Charlestown Wharf Company. In the bill of exceptions certified by the sheriff, this exception is thus stated : "It having been proved, that the south-east corner of Gould's wharf was three hundred and two feet from the old sea wall, mentioned in the act of 1840, *c.* 35, § 4, and that the commissioners' line, as laid down on the plan and claimed by the petitioners, was fifteen feet in advance of said corner ; the sheriff was thereupon requested by the respondents to rule, that there is such an ambiguity in respect to that part of the commissioners' line, that it cannot now be determined where the line is; or, sec ondly, that the true line is five feet nearer the shore." The sheriff refused so to rule, and the respondents excepted.

The court are of opinion, that this decision was right. The question was purely a question of fact upon the evidence. One point mentioned in the statute was the south corner of Gould's wharf, and the line was fixed at fifteen feet distant. The other point was the sea wall, three hundred and twelve feet distant. The former was the first named and the nearest ; the latter, the monument, was the most permanent. But the statute does not fix the point in the sea wall, from which the three hundred and twelve feet were to be measured, and the distance might be so measured as to satisfy both descriptions. But if that could not be done, one must yield. And further, if there was any ambiguity, it was a latent ambiguity, which arose from applying the terms of the statute to the local objects, and was therefore a question of fact for the jury.

2. The second exception turns upon the question, What were the rights of the petitioners, as the successors and assignees of the Charlestown Wharf Company, to extend their wharves beyond the line of low water mark to the commissioners' line, by force of the statute of 1841, *c.* 35? This act authorized the proprietors both above and below Charles River bridge, and between Warren bridge and Prison Point bridge, to extend their wharves into the channel to the commissioners' line, with the privilege to lay vessels at the sides

and ends of their respective wharves, to be built on piles so far as they should be extended into the channel. There was evidence tending to show that the sea wall of the petitioners, between Warren bridge and Prison Point bridge, was built at different distances below high water mark, and above low water mark, filled up behind or towards the shore to high water mark, and used for landing lumber and other things, and that there were pier or pile wharves about eighty feet wide projecting therefrom towards the channel.

The sheriff was requested to instruct the jury that the act of 1841, *c.* 35, did not authorize the sea wall to be advanced by a pier wharf to the commissioners' line, but only the projecting wharves ; and secondly, that as a license it was revocable by the legislature, before it was executed at the part taken by the respondents. These instructions the sheriff declined to give. Both parties also requested instructions as to the right of the petitioners to extend out their whole wharf along the entire extent of the sea wall, upon which the sheriff gave the instructions requested by the petitioner, and declined giving those requested by the respondents. To this the latter excepted. The court are of opinion that the instructions given were right ; that the statute of 1841 operated as a grant to the Charlestown Wharf Company, and not as a mere revocable license, and was not affected by the act incorporating the respondents.

On the other point, the court are of opinion, that the sea wall built below high water mark, and filled up back to high water mark, and used to land lumber and other things upon, being an artificial structure adapted to such a purpose, was a wharf, and that the sheriff rightly instructed the jury, that under the act in question, the grantees, for themselves and their successors, were authorized to extend such wharf, along their whole front, to the commissioners' harbor line. It is to be considered, that without such grant, the owners would have had a right to fill up and cover their entire front to low water mark.

But it is said, that the statute distinguishes between the sea

wall and the wharves, and, therefore, that the same thing could not be meant by both these terms. The statute applies to a long line from the navy yard to the state prison, some part of which had no sea wall or wharf in front of it. And further, it is said, that upon this construction, it would have been superfluous to authorize owners to lay vessels at the sides and ends of their wharves. But there was a good reason why this privilege should be granted, because, although the proprietors would have a right to carry out their whole front to the line, they might not do so, and probably would not, because it would be more useful to leave slips for the access of vessels, and to afford berths for vessels. Should they adopt that mode of improvement, and extend such wharves to the harbor line, and into the channel, with slips between them, the waters at the ends and sides of such wharf, so far as they projected beyond low water mark, would be public water, and such a grant of a privilege to use them and to receive wharfage and dockage therefor might be thought necessary.

3. The next instruction asked for was relative to a claim made by the petitioners, for damages occasioned by the construction of the draw and piers, erected in the channel by the respondents, so near the petitioners' land, as to cause increased expense. There seems to be some contradiction in the instructions said to be given, and perhaps there may be some mistake in the statement. But we are satisfied, that the instructions authorized the jury to give damages for loss occasioned to the petitioners by the erection of a draw and piers, made by the respondents according to an act of the legislature, in the channel of Charles River, by which the course of the currents was changed, and additional sea wall and piling made necessary to secure the petitioners' land. This direction, we think, was incorrect. It is incident to the power of the legislature to regulate a navigable stream, so as best to promote the public convenience; and, if in doing so, some damage is done to riparian proprietors, and some increased expense thrown upon them, it is *damnum absque injuria.* But as this item was separately estimated in the verdict at the

The Fitchburg Railroad Company *v.* The Boston & Maine Railroad.

sum of five hundred dollars, it can be deducted, without the necessity of setting aside the verdict.

4. The respondents requested the sheriff to instruct the jury, that the letter from Jacob Forster, president of the Fitchburg Railroad Company, to Thomas West, president of the Boston & Maine Railroad, dated August 10th, 1844, with the evidence of the subsequent building of the road and wall, proved such an agreement or contract, relating to the subject matter, as to bar the present claim; which instruction the sheriff refused to give.

This was, in our opinion, correct. The evidence shows no elements of a contract, but rather' the offer of a contract declined. There is no price stipulated, no terms, no consideration. As a license, it added nothing to that which the company had before; and it probably referred to the equitable terms of settlement provided for by law, if not otherwise adjusted by negotiation.

5. The petitioners requested the sheriff to instruct the jury, that if they should see fit, they could find the items, or separate claims for damages separately. The sheriff did accordingly instruct them, that finding the entire damages and apportioning them as between landlord and tenant, they would then be at liberty, if they should see fit, to state in their verdict the items of damages, with the amounts, as they should find, against each. To these instructions the respondents excepted. We can perceive no tenable ground for this exception. As a general rule, a jury is not bound to give a special verdict; but where there is an assessment of damages, founded upon distinct and separate grounds, it is a very convenient practice, and may often save a further trial, and subserve the purposes of justice, to state what items they allow and what they reject; and we can see no objection to it.

6. The last exception is to the form of the verdict, which is said to be erroneous, in giving the bulk of the damages for the land over which the petitioners had a right to build a pier wharf. Probably there is an inaccuracy in the terms of the verdict; perhaps some words were left out in copying, or

8 *

otherwise.    But it was merely an inaccuracy in words ; a few words added would make it read, land "owned as well as " "land over which," &c.    We see nothing to warrant the conclusion, that it did not include land owned by the petitioners and taken by the respondents.    But take the language literally ;  " is for the land over which the company have a right to build a pier wharf."    This description embraces land above low water mark, owned by the company, over which they had a right to build a pier wharf, or any other structure, as well as land below low water mark, over which they were authorized to build a pier wharf by the special act of the legislature.    This objection therefore affords no ground for setting aside the verdict.

----

The petitioners having moved for interest on the verdict, and for costs, the opinion of the court was subsequently stated.

SHAW, C. J.    1.  Interest is to be computed on the verdict, after deducting $500 therefrom, according to the opinion heretofore given, to be computed from the time of the appeal taken in the court of common pleas to the time of making up the judgment in this court.

2.  The case having been brought before a jury by the petition of the respondents, and the estimate of damages made by the commissioners having been reduced by the verdict of the jury, no costs of the warrant and jury are to be taxed against either party ; not in favor of the petitioners against the respondents, because they have reduced the damages ; nor in favor of the respondents against the petitioners, because they did not tender the amount estimated by the commissioners, but, on the contrary, claimed a jury to reduce it.    The taxable costs of the appeal are to be taxed for the petitioners here, and included in the certificate.

3.  A certificate is to be issued to the commissioners, as in the preceding case.